**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

**ADAMS OUTDOOR ADVERTISING**
**LIMITED PARTNERSHIP,**
a Minnesota limited partnership,

          Plaintiff,

                                      Civil Action No. 22-cv-51

    v.

**CITY OF MIDDLETON,** a Wisconsin city,
**MARK OPITZ,** City Planner & Zoning
Administrator for the City of Middleton, and
**ABBY ATTOUN**, Director of Planning &
Community Development for the city of
Middleton,

                    Defendants.

---

## COMPLAINT

---

      Plaintiff ADAMS OUTDOOR ADVERTISING LIMITED PARTNERSHIP, by and through its attorneys, Perkins Coie, LLP, for its complaint against Defendants CITY OF MIDDLETON, MARK OPITZ, Zoning Administrator for the City of Middleton, and ABBY ATTOUN, Director of Planning & Community Development for the city of Middleton, says:

### INTRODUCTION

      1.    The City of Middleton's ("City") Sign Code ("Code") is facially unconstitutional because it, among other things, bans all "Off-Premise Signs" with "Commercial Messages" (such as advertising billboards) based on the content of their message without banning other types of signs within the City such as real estate, political, and various non-commercial signs. The City's Code imposes disparate treatment on "Off-Premise Signs" with "Commercial Messages" versus other signs because it favors the content of those other signs, and it does so in a manner that is not

narrowly tailored to advance a compelling governmental interest. This is a violation of Article 1, Section 3 of the Wisconsin Constitution, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §1983. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171-73 (2015).

2.      As such, Plaintiff Adams Outdoor Advertising Limited Partnership ("Adams") brings several facial constitutional challenges to the City's Code, a true and correct copy of which is attached hereto in its current form as Exhibit A. Adams also (and separately) challenges the manner in which the Defendants have applied the Code to Adams. Finally, Adams seeks a declaratory judgment that a permit application it submitted to the City was approved by the City under the provisions of the Code.

3.      Adams seeks, among other things, declaratory relief, injunctive relief, and money damages based on the City's deprivation, under color of state law, of rights guaranteed to Adams by the Wisconsin Constitution, the United States Constitution, and 42 U.S.C. §1983.

## PARTIES, JURISDICTION, AND VENUE

4.      Adams is a limited partnership formed under the laws of the State of Minnesota, with local offices in Madison and Kenosha, Wisconsin. Adams' principal place of business is located in Michigan. None of the members, general, or limited partners of Adams is a citizen of Wisconsin.

5.      Upon information and belief, Defendant City of Middleton ("City") is a municipal, political subdivision of the State of Wisconsin, duly organized and operating under the laws of Wisconsin as a city of the third class, with its municipal governmental offices located at 7426 Hubbard Avenue, Middleton, Wisconsin 53562.

6.     Upon information and belief, Defendant Mark Opitz is an individual who resides in the City, is the City's authorized representative (the "City Planner and Zoning Administrator") and acted in concert with the City and/or other City officials with respect to the allegations contained herein.

7.     Upon information and belief, Defendant Abby Attoun is an individual who resides in the City, is the City's authorized representative (the "Director of Planning and Community Development") and acted in concert with the City and/or City officials with respect to the allegations contained herein (where appropriate, the City, the City Planner and Zoning Administrator, and the Director of Planning and Community Development shall be referred to collectively as "Defendants").

8.     Any and all actions taken by the City, the City Planner and Zoning Administrator, and/or the Director of Planning and Community Development, as detailed herein, were taken under the color of state law for purposes of 42 U.S.C. §1983.

9.     This Court has jurisdiction over Plaintiff's constitutional claims and civil rights claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(3) and (4).

10.    This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds $75,000.00, exclusive of interest and costs. Diversity jurisdiction exists because Plaintiff and Defendants are citizens of different states.

11.    This Court also has jurisdiction pursuant to 28 U.S.C. §2201 and 2202 to declare the parties' rights and to grant all further relief found necessary and proper.

12.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because, *inter alia*, one or more Defendants reside in this judicial district and the property in question is located in this judicial district.

13.     Adams has standing to bring the claims asserted in this Complaint—including but not limited to—claims that the Code (as defined herein), or sections thereof, is unconstitutional on its face, that the Defendants are applying the Code, or sections thereof, in an unconstitutional or improper manner as to Adams, and that the Code's permitting scheme acts as an unlawful prior restraint.

## GENERAL ALLEGATIONS

### ADAMS' INTERESTS WITHIN THE CITY

14.     At all relevant times, Adams has been engaged in all aspects of the outdoor advertising business, including but not limited to the sale/lease of billboard space, and the securing of real property and property rights (through outright ownership and/or leases of said property) for use as locations for outdoor advertising, both within and outside the City and the State of Wisconsin.

15.     Adams and third-parties who wish to convey messages to others through the use of billboard space enjoy the right to engage in, attempt to engage in, and actually engage in, speech that is protected by Article 1, §3 of the Wisconsin Constitution and the First and Fourteenth Amendments of the United States Constitution, including but not limited to political speech, social speech, public service speech, other forms of noncommercial speech, and commercial speech, both within and outside the City and the State of Wisconsin.

16.     The City regulates signs within the City—including billboards owned or operated by Adams—through Chapter 22 - Sign Code (the "Code") of Middleton's City Code of Ordinances. *See* Exhibit A.

17.     Adams leases two parcels of real property within the City on which Adams has erected and maintains billboards and engages in its outdoor advertising business: (1) Tax Parcel

No. 255/0708-104-8510-2  located at 8321 University Ave., Middleton, Wisconsin, and (2) Tax Parcel No.  255/0808-353-9391-2 located at 4817 Parmenter Street, Middleton, Wisconsin. By leasing these parcels of real property, Adams and third parties are able to engage in political speech, social speech, public service speech, other forms of noncommercial speech, or commercial speech through the use, sale, or lease of billboard space.

18.    Pursuant to other real property rights or property interests Adams has within the City in the form of permits and vested non-conforming rights, Adams routinely enters into contractual agreements with third parties in the form of real property leases or property licenses for the right to engage in the business of outdoor advertising on such property; through such contractual agreements, Adams and third parties are able to engage in political speech, social speech, public service speech, other forms of noncommercial speech, or commercial speech through the use, sale, or lease of billboard space.

19.    In total, Adams owns four billboard structures within the City, with a total of eight billboard faces. All such billboards and faces are subject to the regulations and restrictions in the Code and are deemed to be an existing non-conforming use pursuant thereto.

20.    The majority of these billboards were built with (and currently contain) traditional static display faces. However, through the use of digital technology, billboard signs are now capable of providing a sequence of messages electronically.

21.    Effective June 2006, the State of Wisconsin amended the law to authorize billboards to contain digital multiple-message technology. *See* 2005 Wis. Act 464. Wisconsin law only allows still, non-moving, images on digital displays and flashing, blinking, and/or scrolling effects are prohibited.

22.     Since digital billboards became legal, Adams has obtained state and local permits to install digital billboards in several Wisconsin jurisdictions, such as the Cities of Kenosha, Racine and Sun Prairie; the Villages of DeForest and Waunakee; and the Town of Madison. Adams complies with all State and local regulations in operating its digital billboards.

23.     Digital billboards are the only type of sign technology that allow Amber Alerts and other time-sensitive emergency messages to be communicated to the traveling public at a moment's notice. Therefore, they provide an extremely critical means of First Amendment communication.

24.     As an example, and not by way of limitation, on April 10, 2017, the Federal Bureau of Investigation ("FBI") provided an update to the Outdoor Advertising Association of America ("OAAA") regarding the capture of fugitive Demeko Wells using digital billboards. The FBI stated the following in its update: "Fugitive Demeko Wells was featured on digital billboards in the Tampa, FL, area. The pressure created by the billboards influenced Wells to turn himself in the day after the billboards were posted. . . . After turning himself in, Wells admitted to the agents that he had seen himself on the billboards. He was arrested on March 23, 2017. The fugitive was charged with the following: Identity theft; access device fraud; and conspiracy. . . . **Due to the current addition of Demeko Wells, 57 fugitives from multiple cities across the country have been apprehended as a direct result of tips received from digital billboards**." (emphasis added). Adams partners with the FBI in providing digital billboard space at no charge to the FBI on an immediate, and as-requested and as-needed basis, for messages regarding public safety and wanted fugitives.

25.     Indeed, Adams has tied all of its digital billboards throughout the country into a network that allows public safety and informational messages to be shown on the signs at the push of a button.

26.     Adams routinely uses its digital billboards located in Wisconsin and throughout the country to communicate information such as (i) Amber Alerts; (ii) the photographs of wanted fugitives and the contact information of police, (iii) emergency messages, such as weather alerts; (iv) information of great public interest (such as election results and messages furthering the mission of certain non-profit organizations); and (v) notification of community events.

27.     As a further example, and not by way of limitation, on May 19, 2017, also known as Endangered Species Day, the National Geographic Society and the OAAA launched a groundbreaking traditional and digital billboard campaign aimed at saving animal species at risk in the wild. The campaign featured stunning images from the National Geographic Photo Ark and sounded the alarm for the conservation of wildlife and wildlife habitat. Founded by National Geographic photographer Joel Sartore, the Photo Ark aims to document every species currently living in the world's zoos and wildlife sanctuaries, inspire action through education, and help save wildlife by supporting on-the-ground conservation efforts. More than 25 animals from the Photo Ark were featured in the campaign, including the Florida panther, the Saint Vincent Amazon parrot, the Golden Snub-nosed monkey, and the Malayan tiger, of which there are only an estimated 340 left in the wild. After May 19, 2017, the campaign expanded throughout the United States, where Photo Ark animals were featured on printed and digital billboards, bus shelters, airport dioramas, mall kiosks, and other billboard formats throughout the summer. Across the country, more than 43,000 digital billboard screens featured Photo Ark images. Adams participated

in the Photo Ark campaign by donating its traditional and digital billboard space to the campaign in all states in which Adams operates.

28.    As described in more detail below, the City's Code, among other things, unconstitutionally prohibits Adams from erecting new billboards, from erecting digital billboards, and from replacing existing billboards throughout the City. In other words, the City's Code is designed to eventually completely eliminate an important and protected form of speech based on the content of such speech.

### ADAMS' PERMIT APPLICATION

29.    On October 18, 2021, Adams submitted a permit application to erect a sign on Parcel No. 255/0708-023-4558-2 in the Airport Business Park in the City.

30.    On November 29, 2021, well more than thirty days after the application was submitted, the Director of Planning and Community Development (and thus the City) emailed Adams stating the City could not issue the permit requested, citing various sections of the Code as the basis for the City's denial—including but not limited to—Section 22.08(4), which imposes onerous regulations on "Electronic Variable Message Signs" (i.e., digital billboards). A true and correct copy of the Director of Planning and Community Development's email is attached hereto as Exhibit B. Where appropriate herein, the Director of Planning and Community Development's denial email shall be referred to as the "Denial."

31.    The First Amendment does not authorize such an onerous regulation on a critical means of communication. *See e.g.*, *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696, 709-10 (5th Cir. 2020), *cert. granted sub nom. City of Austin v. Reagan Nat'l Advert. of Texas, Inc.*, 141 S. Ct. 2849 (2021) (city's code prohibiting "off-premises digital signs" failed strict scrutiny because prohibition was content based, and the code was not "narrowly tailored to serve

a compelling government interest"); *see also E & J Equities, LLC v. Board of Adjustment of the Township of Franklin*, 146 A.3d 623, 643-44 (N.J. 2016) (onerous regulations on digital signs failed intermediate scrutiny because they were based solely on "unsupported suppositions, fears, and concerns").

32.     It took the Director of Planning and Community Development (and thus the City) 42 days to process Adams' permit application and issue the Denial.

33.     Under Section 22.04(3)(c) of the Code, however, Adams' permit was granted by virtue of the City's failure to act on Adams' application within 30 days of filing

34.     Regardless, Adams is not required to administratively appeal the Denial prior to bringing this action because, at a minimum: (a) the Denial was ineffectual as a matter of law because Adam's permit had already been granted by the passage of time; (b) pursuing such a remedy would be futile; and (c) a plaintiff such as Adams is not required to administratively appeal a licensing decision prior to bringing facial constitutional challenges to an ordinance.

**COUNT I**
**FACIAL CHALLENGE TO THE CONSTITUTIONALITY OF THE CODE AS A CONTENT-BASED RESTRICTION ON SPEECH**

35.     Adams incorporates by reference Paragraphs 1 through 34 of this Complaint as if each Paragraph was set forth herein in its entirety.

36.     The Code, on its face, defines "Off-Premise Signs" according to the content of the message and/or what type of information the message conveys.

37.     The Code, on its face, is unconstitutional because it regulates "Off-Premise Signs" based on the content of the message and the intent of the speaker and because, among other things, all such signs are deemed to be nonconforming under the Code. No other types of signs or messages are categorically prohibited in the Code based on the content of the message; therefore,

"Off-Premise Signs" are discriminated against and treated differently than other types of signs or messages under the Code based on the content of the message and/or what type of information the message conveys.

38.     More specifically, section 22.02(36) of the Code, on its face, defines and regulates "Off-Premise Signs" according to the content of the message and/or what type of information the message conveys: "'Off-Premise Sign' means [a] sign which displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the lot where such sign is located."

39.     Section 22.02(10) of the Code, on its face, also defines and regulates "Commercial Message" according to the content of the message and/or what type of information the message conveys: "'Commercial Message' means a message that directs attention to or acts as advertising for a business, commodity, product, service or form of entertainment or tends to encourage the occurrence of a commercial transaction related thereto."

40.     Section 22.12(2), on its face, prohibits "Off-Premise Signs" with "Commercial Messages" according to the content of the message and/or what the message is intended to convey, and treats such signs differently by imposing a blanket prohibition on such signs. The Code does not prohibit other types of signs and messages based on the content of the message and/or what the message is intended to convey. Indeed, Section 22.12 prohibits only four other types of signs: "Abandoned Signs," "Inflatable Signs," "Signs attached to any public utility pole or structure, street tree, fence, fire hydrant, bridge, curb, sidewalk, park bench, or other location on public property," and "Beacons." Unlike with "Off-Premise Signs", the scope of all these four additional

prohibitions relies on the *form* of the signs and not on the content of the messages and/or what the messages are intended to convey.

41.     Section 22.02(2) of the Code, on its face, defines and regulates "Ancillary Sign" according to the content of the message and/or what type of information the message conveys.

42.     Section 22.02(3) of the Code, on its face, defines and regulates "Attention-Attracting Object" according to the content of the message and/or what type of information the message conveys.

43.     Section 22.02(5) of the Code, on its face, defines and regulates "Banner" according to the content of the message and/or what type of information the message conveys.

44.     Section 22.02(7) of the Code, on its face, defines and regulates "Business Opening Sign" according to the content of the message and/or what type of information the message conveys.

45.     Section 22.02(9) of the Code, on its face, defines and regulates "Changeable Copy Sign" according to the content of the message and/or what type of information the message conveys.

46.     Section 22.02(12) of the Code, on its face, defines and regulates "Construction Sign" according to the content of the message and/or what type of information the message conveys.

47.     Section 22.02(14) of the Code, on its face, defines and regulates "Directional Sign, On-Premise" according to the content of the message and/or what type of information the message conveys.

48.     Section 22.02(15) of the Code, on its face, defines and regulates "Directional Sign, Off-Premise" according to the content of the message and/or what type of information the message conveys.

49.     Section 22.02(18) of the Code, on its face, defines and regulates "Directory Sign" according to the content of the message and/or what type of information the message conveys.

50.     Section 22.02(23) of the Code, on its face, defines and regulates "Garage Sale Sign" according to the content of the message and/or what type of information the message conveys.

51.     Section 22.02(24) of the Code, on its face, defines and regulates "Government Sign" according to the content of the message and/or what type of information the message conveys.

52.     Section 22.02(30) of the Code, on its face, defines and regulates "Logo" according to the content of the message and/or what type of information the message conveys.

53.     Section 22.02(32) of the Code, on its face, defines and regulates "Memorial Sign" according to the content of the message and/or what type of information the message conveys.

54.     Section 22.02(33) of the Code, on its face, defines and regulates "Menu Sign" according to the content of the message and/or what type of information the message conveys.

55.     Section 22.02(35) of the Code, on its face, defines and regulates "Noncommercial Message" according to the content of the message and/or what type of information the message conveys.

56.     Section 22.02(37) of the Code, on its face, defines and regulates "On-Premise Sign" according to the content of the message and/or what type of information the message conveys.

57.     Section 22.02(43) of the Code, on its face, defines and regulates "Real Estate Sign" according to the content of the message and/or what type of information the message conveys.

58.     Section 22.02(44) of the Code, on its face, defines and regulates "Sign" according to the content of the message and/or what type of information the message conveys.

59.     Section 22.11 of the Code, on its face, defines and regulates "Signs Exempt from Permit" according to the content of the message and/or what type of information the message conveys.

60.     On its face, the Code renders all existing "Off-Premise Signs" within the City nonconforming and completely prohibits any new "Off-Premise Signs" from being erected within the City. No other types of signs are similarly deemed nonconforming or completely prohibited based on the content of the message and/or what the message is intended to convey. These restrictions of "Off-Premise Signs" in the Code are content-based and not narrowly tailored to serve a recognized and identified government interest, and reasonable alternative channels of communication do not exist to disseminate the information that Adams (and those similarly situated to Adams) seeks to distribute. As such, the Code, as it relates to these restrictions of "Off-Premise Signs," is unconstitutional on its face.

61.     There is no stated or justifiable reason in the Code for the City's content-based disparate treatment and strict regulation of "Off-Premise Signs."

62.     There is also no stated or justifiable reason in the Code for the City's content-based disparate treatment and strict regulation of "Commercial Messages."

63.     There is no stated or justifiable reason in the Code for the City's content-based preferential treatment or relaxed regulation of the types of signs identified in Paragraphs 41 through 59 (inclusive) of this Complaint.

64.     Content-based distinctions, restrictions, and/or regulations on speech, such as the distinctions, restrictions, and/or regulations regarding "Off-Premise Signs," "Commercial

Messages," and the types of signs identified in Paragraphs 41 through 59 (inclusive) of this Complaint, are presumptively unconstitutional, subject to strict scrutiny, and may only be upheld if narrowly tailored to serve a compelling government interest.

65.     On their face, the content-based distinctions, restrictions, and/or regulations regarding "Off-Premise Signs," "Commercial Messages," and the types of signs identified in Paragraphs 41 through 59 (inclusive) of this Complaint are not narrowly tailored to serve a compelling government interest.

66.     On its face, the Code as it relates to "Off-Premise Signs" and "Commercial Messages " is not a valid time, place, or manner regulation of constitutionally protected speech.

67.     By making content-based distinctions, restrictions, and/or regulations on speech throughout the Code, the City has violated the Wisconsin Constitution, including but not limited to Article 1, §3.

68.     By making content-based distinctions, restrictions, and/or regulations on speech throughout the Code, the City has violated the United States Constitution, including but not limited to the First and Fourteenth Amendments.

## COUNT II
## FACIAL CHALLENGE TO THE CONSTITUTIONALITY OF THE CODE'S COMPLETE BAN ON DIGITAL BILLBOARDS

69.     Adams incorporates by reference Paragraphs 1 through 68 of this Complaint as if each Paragraph was set forth herein in its entirety.

70.     The City's Code also completely bans all digital billboards in the City, which constitutes an unconstitutional prior restraint.

71.     The Code effectuates this ban on digital billboards in two ways.

72.     First, as discussed in Count I above, Section 22.12(2) of the Code prohibits all "Off-Premise Signs", including both static and digital billboards.

73.     Second, Section 22.08(4)(b)(1) prohibits any "Electronic Variable Message" sign within the City from being greater than 40 square feet in size. This prohibition applies to both digital signs conveying commercial messages as well as digital signs conveying non-commercial messages. As all billboards are generally greater than 40 square feet in size, this provision constitutes an unlawful prior restraint on all digital billboards.

74.     On its face, these Code provisions constitute an unlawful prior restraint of an entire medium of commercial and non-commercial speech.

75.     In addition, the City's Code provides no justification for its size limit on "Electronic Variable Message" signs.

76.     For these reasons and the other reasons provided herein, the City's complete ban on digital billboards is unconstitutional.

## COUNT III
## FACIAL VAGUENESS/PROCEDURAL DUE PROCESS AND OVERBREADTH CHALLENGE TO THE CONSTITUTIONALITY OF THE CODE

77.     Adams incorporates by reference Paragraphs 1 through 76 of this Complaint as if each Paragraph was set forth herein in its entirety.

78.     Section 22.02(17) of the Code defines "Director" as: "the **Director of Planning and Zoning** or any individual acting under a grant of authority to administer this Chapter by the Director of Planning and Zoning." There is no City official with the title "**Director of Planning and Zoning**" listed in the City's staff directory.[1]

---

[1] *See* https://www.cityofmiddleton.us/Directory.aspx

79.     Section 22.02(3) of the Code defines "Attention-Attracting Object" as: "any streamer, pinwheel, pennant, flag, propeller, inflatable sign, statuary, tethered balloon, bunting, beacon, or other artificial device, figure, shape, color, sound, light or exhibit, whether live, animated, or still, that is **intended to** attract attention to the use or business being conducted on the site. Attention-attracting object does not include the flag of any governmental entity." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether the speaker "**intended to**" attract attention to determine whether a message qualifies as an "Attention-Attracting Object."

80.     Section 22.02(10) of the Code defines "Commercial Message" as: "a message that **directs attention** to or acts as advertising for a business, commodity, product, service or form of entertainment or **tends to encourage** the occurrence of a commercial transaction related thereto." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a message "**directs attention**" to one of the listed items, or "**tends to encourage**" the occurrence of a commercial transaction to determine whether a message qualifies as a "Commercial Message."

81.     Section 22.02(13) of the Code defines "Copy" as: "words, letters, numbers, figures, designs, or other **symbolic representations** incorporated into a sign." "Symbolic representations" is not defined in the Code; thus, by definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether something is a "**symbolic representation**" to determine whether it qualifies as "Copy."

82.     Section 22.02(25) of the Code defines "Ground Sign" as: "any free-standing sign that is supported by structures or supports in or upon the ground and independent of support from any building. A single sign structure having two identical or **nearly identical** faces back to back shall constitute a single sign. For the purposes of this definition, a ground sign is intended to refer to a primary, permanent, ground-mounted sign, not a temporary sign or sign that is ancillary to the primary sign, such as a directional sign or portable sign." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether the two faces of a sign are "**nearly identical**" to determine whether the two sides of a sign constitute a single sign.

83.     Section 22.02(29) of the Code defines "Legal Non-Conforming Sign" as: "any sign which was lawfully erected and displayed on **[clerk to insert effective date]**, but which does not conform to the requirements and limitations herein, or any sign which was lawfully erected and displayed on the effective date of any amendment to this Chapter, but which does not conform to such amendment." The "**effective date**" is not provided anywhere in the Code.

84.     Section 22.02(35) of the Code defines "Noncommercial Message" as: "a message **intended to** direct attention to a political, social, community or public service issue or an idea, aim viewpoint, aspiration or purpose and **not intended** to produce any commercial benefit or **tend to encourage** a commercial transaction." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether the speaker "**intended to**" to direct attention to one of the items listed, what the speaker "**intended**" to produce for themselves, and whether the message "**tends to** encourage" a commercial transaction to determine whether the message qualifies as a "Noncommercial Message."

85.     Section 22.02(36) of the Code defines "Off-Premise Sign" as: "sign which displays any message **directing attention to** a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the lot where such sign is located." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a sign has a message "**directing attention to**" one of the items listed to determine whether the sign qualifies as a "Off-Premise Sign."

86.     Section 22.02(37) of the Code defines "On-Premise Sign" as: "a sign which displays any message **directing attention to** a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs on the same lot as the sign." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a sign has a message "**directing attention to**" one of the items listed to determine whether the sign qualifies as a "On-Premise Sign."

87.     Section 22.02(39) of the Code states that, when used in reference to a sign, "Permanent" means "that the sign is constructed of durable materials and **intended to** exist for an indefinite period of time or the duration of the time that the use or occupant is located on the premises and is generally, but not necessarily, affixed to the ground or structure. Unless the context clearly dictates otherwise, the term "permanent" in this Chapter is not intended to mean literal permanence, but rather it is meant to distinguish such signs from more transient or temporary signage." By definition, the Director of Planning and Zoning must form a **subjective** personal

opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a sign is "**intended to**" exist for an indefinite period of time or for the period of time specified to determine whether the sign qualifies as "Permanent."

88.    Section 22.02(44) of the Code defines "Sign" as: "any display of lettering, logos, colors, lights, or illuminated neon tubes visible to the public from outside of a building or from a traveled way, that either **conveys a message** to the public, or **intends to** advertise, direct, invite, announce or draw attention to any event, goods, products, services, facilities, persons, property interest or business." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a speaker "**conveys a message**" or "**intends to**" advertise one of the items listed to determine whether a display qualifies as a "Sign."

89.    Section 22.04(2) of the Code provides, in relevant part: "All applications for sign permits shall be filed on a **form supplied by the Director**[,] . . . shall be submitted with **all required information provided** and shall contain or have attached thereto the following information: . . . Such **other information** as the City **may** require to ensure compliance with this Sign Ordinance and any other applicable laws." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether an application for a permit is in the correct **form** or contains "**all required information**," and "**may**" require "**other information**" to ensure compliance with the Code. *See e.g., Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1252 (10th Cir. 2000) ("catch-all provision confers unbridled discretion upon the director [to] demand any piece of information from an applicant and lawfully deny a permit if the applicant refuses such request"). Finally, use of the word "**may**" in this section of the Code is an impermissible grant of

discretion to the City; indeed, ordinances that utilize the word "may" have routinely been invalidated as unconstitutional. *See e.g., id.* at 1250-52 (striking down provision of licensing scheme that permitted state agency to request "any additional information [it] may require" as part of application process); *see also The Lamar Co. v. City of Marietta*, 538 F. Supp. 2d 1366, 1372-74 (N.D. Ga. 2008) (holding that the use of the word "may" afforded local officials total control over a sign permit, that such discretion created the potential for local officials to arbitrarily suppress undesirable speech, and that this single deficiency caused the entire code to be invalid).

90.    Section 22.04(3) of the Code provides, in relevant part: "It shall be the duty of the Director, upon the filing of an application for a sign permit, to examine the application for compliance with the requirements of this chapter and, **if deemed necessary by the Director**, to inspect the premises upon which the proposed sign is to be erected." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether they **deem it necessary** to inspect the premises upon which the proposed sign is to be erected.

91.    Section 22.05(2) of the Code provides, in relevant part: "All signs shall be designed to fit the zoning and **character** of the **surrounding area**." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether the design of a sign fits the "**character**" of the "**surrounding area**" to interpret and apply this provision of the Code.

92.    Section 22.05(4) of the Code provides: "The number of colors and materials of the sign should be **kept to a minimum**." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad**

**hoc** determination regarding whether the colors and materials of a sign are "**kept to a minimum**" to interpret and apply this provision of the Code.

93.     Section 22.06(2)(c) of the Code provides, in relevant part: "No sign shall be erected or maintained at any location where by reason of its position, wording, illumination, size, shape, or color it **may obstruct, impair, obscure the vision of road users**, or otherwise **obstruct, interfere with the view of**, or **be confused with**, any authorized traffic control sign, signal or device." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a sign "**may**" "**obstruct, impair, [or] obscure the vision of road users**," or "**obstruct [or] interfere with the view of**" one of the items listed, or "**be confused with**" one of the items listed to interpret and apply these provisions of the Code. In addition, ordinances that utilize the word "may" have routinely been invalidated as unconstitutional.

94.     Section 22.06(6) of the Code provides: "All signs, including nonconforming signs, and sign structures shall be maintained to preserve the appearance and structural integrity **substantially identical** to the new condition of the sign." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether the appearance of a sign is "**substantially identical**" to the new condition of the sign to interpret and apply these provisions of the Code.

95.     Section 22.08(2)(a) of the Code provides, in relevant part: "There shall be no more than one (1) ground sign for each street on which the lot has frontage, except one additional ground sign per lot frontage **may** be allowed for any lot frontage over one thousand (1,000) linear feet." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether

they "**may**" allow an additional ground sign on a lot with frontage over one thousand linear feet. In addition, ordinances that utilize the word "may" have routinely been invalidated as unconstitutional.

96.     Section 22.10(3)(i) of the Code provides, in relevant part: "the sign permit **may** be revoked by the Director following notice to the permittee. The permit **may** be revoked if one or more conditions outlined in this section have been violated, or if the sign **is determined to constitute a public nuisance** not specifically outlined in this section." By definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether they "**may**" revoke a portable sign permit for one of the reasons listed, or whether the sign "**constitute[s] a public nuisance**" to interpret and apply these provisions of the Code. In addition, ordinances that utilize the word "may" have routinely been invalidated as unconstitutional.

97.     Section 22.13 of the Code provides, in relevant part: "Any legal non-conforming sign may continue to be displayed but may not be replaced unless it is damaged **suddenly** by fire, flood, explosion, earthquake, war, riot, or **act of God**. A legal, nonconforming sign that has deteriorated due to lack of regular maintenance to the point where it **has lost fifty (50) percent or more of its replacement cost** shall lose its legal non-conforming status" "Act of God" is not defined in the Code; thus, by definition, the Director of Planning and Zoning must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a sign was "**suddenly"** damaged by one of the reasons listed, whether any other reason qualifies as an "**act of God**," and whether a sign has "**lost fifty (50) percent or more of its replacement cost**" to interpret and apply these provisions of the Code.

98.     Section 22.17(1) of the Code provides, in relevant part: "If the Director, Building Inspector, Electrical Inspector, or Code Compliance Manager finds that any sign has been erected, altered, or is being maintained in violation of this section, or **is in an unsafe condition as to be a menace to the safety, health, or welfare of the public**, he or she shall give written notice to the owner thereof of the person entitled to possession of the sign and the owner of the real estate upon which the sign is located" By definition, the Director of Planning and Zoning, or one of the other City officials listed, must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a sign "**is in an unsafe condition as to be a menace to the safety, health, or welfare of the public**" to interpret and apply this provision of the Code.

99.     On its face, the Code, as it relates to any one, more, or all of the matters detailed in Paragraphs 78 through 98 (inclusive) of this Complaint is vague, ambiguous, and/or overbroad, and does not provide fair notice to Adams (and those similarly situated to Adams) of the conduct proscribed by the Code.

100.     On its face, the Code, as it relates to any one, more, or all of the matters detailed in Paragraphs 78 through 98 (inclusive) of this Complaint confers on the City and/or the Director of Planning and Zoning the sole, unstructured, unlimited, and/or unbridled discretion to determine matters such as whether an offense has been committed, whether a condition has been satisfied, and/or whether to permit or deny constitutionally protected speech.

101.     On its face, the Code, as it relates to any one, more, or all of the matters detailed in Paragraphs 78 through 98 (inclusive) of this Complaint is vague, ambiguous, and/or overbroad, and does not provide fair notice to Adams (and those similarly situated to Adams) of when a permit may be necessary to engage in constitutionally protected speech.

102. On its face, the Code, as it relates to any one, more, or all of the matters detailed in Paragraphs 78 through 98 (inclusive) of this Complaint confers on the City and/or the Director of Planning and Zoning unstructured, unlimited, and/or unbridled discretion to determine when a permit is necessary to engage in constitutionally protected speech.

103. On its face, the Code renders all existing "Off-Premise Signs" within the City nonconforming and completely prohibits any new "Off-Premise Signs" from being erected within the City. These restrictions of "Off-Premise Signs" in the Code are thus not narrowly tailored to serve a recognized and identified government interest, and reasonable alternative channels of communication do not exist to disseminate the information that Adams (and those similarly situated to Adams) seeks to distribute. As such, the Code as it relates to these restrictions of "Off-Premise Signs" is overbroad and unconstitutional on its face.

104. On its face, Section 22.08(4)(b) of the Code imposes additional regulations and limitations on "Electronic Variable Message Signs" that are not imposed on other type of Changeably Copy Signs. There is no stated or justifiable reason in the Code for the heightened regulation of "Electronic Variable Message Signs." The heightened regulation of "Electronic Variable Message Signs" in the Code is thus not narrowly tailored to serve a recognized and identified government interest, and reasonable alternative channels of communication do not exist to disseminate the information that Adams (and those similarly situated to Adams) seeks to distribute. As such, the Code, as it relates to the onerous regulation of "Electronic Variable Message Signs," is overbroad and unconstitutional on its face.

105. By being vague, ambiguous, and/or overbroad, the Code violates the Wisconsin Constitution, including but not limited to Article 1, §§ 1 and 3.

106.    By being vague, ambiguous, and/or overbroad, the Code violates the United States Constitution, including but not limited to the First and Fourteenth Amendments.

107.    By being vague, ambiguous, and/or overbroad, the Code arbitrarily deprives, and/or attempts to deprive, Adams (and those similarly situated to Adams) of its vested property rights.

108.    By being vague, ambiguous, and/or overbroad, the Code is arbitrary, capricious, and/or unfounded; and otherwise results in the arbitrary deprivation of Adams' (and those similarly situated to Adams) vested property rights/interests without due process of law.

109.    By being vague, ambiguous, and/or overbroad, the Code violates Adams' (and those similarly situated to Adams) civil rights.

## COUNT IV
## FACIAL CHALLENGE TO THE CONSTITUTIONALITY OF VARIOUS ADDITIONAL CODE PROVISIONS AS A PRIOR RESTRAINT

110.    Adams incorporates by reference Paragraphs 1 through 109 of this Complaint as if each Paragraph was set forth herein in its entirety.

111.    Section 22.04 of the Code contains several provisions that attempt to explain how and when one needs to obtain a permit with respect to a sign.

112.    Section 22.04(3) of the Code fails to set forth content-neutral criteria—such as narrow, objective, and definite standards—to ensure that the City's and/or the Director of Planning and Zoning's permitting decisions are not based on the content or viewpoint of the speech or message.

113.    Section 22.04(3) of the Code fails to create a permitting or licensing scheme that reduces the City and/or Director of Planning and Zoning's act of granting or denying a permit or license to a ministerial one, without the exercise of judgment or the formation of an opinion by the City and/or Director of Planning and Zoning.

114.    Section 22.05 of the Code contains several provisions that attempt to designate review criteria for the design of signs within the City.

115.    Section 22.05 of the Code fails to set forth content-neutral criteria—such as narrow, objective, and definite standards—to ensure that the City's and/or the Director of Planning and Zoning's permitting decisions are not based on the content or viewpoint of the speech or message.

116.    Section 22.05 of the Code fails to create a permitting or licensing scheme that reduces the City and/or Director of Planning and Zoning's act of granting or denying a permit or license to a ministerial one, without the exercise of judgment or the formation of an opinion by the City and/or Director of Planning and Zoning.

117.    For example, and not by way of limitation, Sections 22.04(3) and 22.05 of the Code lack all of the following:

(a)    Clearly defined—*i.e.*, not vague or overbroad—terms;

(b)    Any guarantee of prompt judicial review of a decision denying or revoking a permit or license; and/or

(c)    Any requirement that the status quo be maintained during any period of review.

118.    Sections 22.04(3) and 22.05 of the Code lack any procedural safeguards or neutral criteria of any type with respect to permitting or licensing.

119.    Sections 22.04(3) and 22.05 of the Code give the City and/or the Director of Planning and Zoning unbridled and/or boundless discretion to determine whether to permit or deny expressive activity.

120.    Sections 22.04(3) and 22.05 of the Code leave the decision whether to grant or deny a permit or license to the whim of the City and the Director of Planning and Zoning.

121.    Variance procedures such as those in Section 22.14(1) that are discretionary and subjective in nature are a form of prior restraint and are unconstitutional. *See e.g.*, *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999) (variance criteria that empowered zoning board to covertly discriminate against speech activity under the guise of general "compatibility" or "environmental" considerations was unconstitutional); *see also Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996); *Lamar Advert. Co. v. City of Douglasville*, 254 F. Supp. 2d 1321, 1329-30 (N. D. Ga 2003 (ordinance stating that all applications meeting the zoning code standards "shall be granted" was nevertheless unconstitutional because it "grant[ed] the City too much discretion in determining when to permit a variance").

122.    As an unconstitutional prior restraint, the Code violates the Wisconsin Constitution, including but not limited to Article 1, §3.

123.    As an unconstitutional prior restraint, the Code violates the United States Constitution, including but not limited to the First and Fourteenth Amendments.

124.    As an unconstitutional prior restraint, the Code arbitrarily deprives, and/or attempts to deprive, Adams (and those similarly situated to Adams) of its vested property rights.

125.    As an unconstitutional prior restraint, the Code is arbitrary, capricious, and/or unfounded; and otherwise results in the arbitrary deprivation of Adams' (and those similarly situated to Adams) vested property rights/interests without due process of law.

126.    As an unconstitutional prior restraint, the Code violates Adams' (and those similarly situated to Adams) civil rights.

## COUNT V
## FACIAL CHALLENGE TO THE CONSTITUTIONALITY OF THE CODE AS A VIOLATION OF EQUAL PROTECTION AND/OR SUBSTANTIVE DUE PROCESS

127.    Adams incorporates by reference Paragraphs 1 through 126 of this Complaint as if each Paragraph was set forth herein in its entirety.

128.    On its face, the Code makes content-based distinctions between "Off-Premise Signs" with "Commercial Messages" and all other types of signs or messages, and treats "Off-Premise Signs" with "Commercial Messages" differently than all other types of signs or messages based on such content-based distinctions.

129.    On its face, the Code restricts and regulates "Off-Premise Signs" and "Commercial Messages" based on content and the intent of the speaker.

130.    For example, and not by way of limitation, the Code provides for the following:

(a)    Section 22.11 of the Code, which relates to "Signs Exempt From Permit," contains numerous content-based exemptions that allow non-commercial and various other types of signs—including but not limited to signs on city owned property, political and election campaign signs, and real estate signs advertising properties—to be erected and displayed without a permit, while providing no exemptions to "Off-Premise Signs";

(b)    Section 22.12 of the Code renders all existing "Off-Premise Signs" within the City nonconforming and completely prohibits any new "Off-Premise Signs" from being erected within the City. No other types of signs are similarly deemed nonconforming or completely prohibited based on the content of the message or the intent of the speaker;

131.    The facially disparate treatment of "Off-Premise Signs" with "Commercial Messages" under the Code violates the Wisconsin Constitution, including but not limited to Article 1, §1.

132.    The facially disparate treatment of "Off-Premise Signs" with "Commercial Messages" under the Code is arbitrary, capricious, and/or unfounded; and otherwise results in the

arbitrary deprivation of Adams' (and those similarly situated to Adams) vested property interests without due process of law.

133.    The facially disparate treatment of "Changeable Copy Signs" with "Electronic Variable Message Signs" and with other "Signs" under the Code is arbitrary, capricious, and/or unfounded; and otherwise results in the arbitrary deprivation of Adams' (and those similarly situated to Adams) vested property interests without due process of law.

134.    The facially content-based distinctions, restrictions, and regulations with respect to "Off-Premise Signs" and "Commercial Messages" and all other types of signs or messages under the Code violate the Wisconsin Constitution, including but not limited to Article 1, §1.

135.    The facially content-based distinctions, restrictions, and regulations with respect to "Off-Premise Signs" and "Commercial Messages" and all other types of signs or messages under the Code violate the United States Constitution, including but not limited to the Equal Protection Clause of the Fourteenth Amendment.

136.    The facially content-based distinctions, restrictions, and regulations with respect to "Off-Premise Signs" and "Commercial Messages" and all other types of signs or messages under the Code are arbitrary, capricious, and/or unfounded; and otherwise result in the arbitrary deprivation of Adams' (and those similarly situated to Adams) vested property interests without due process of law.

**COUNT VI**
**"AS APPLIED" CHALLENGE TO THE CONSTITUTIONALITY OF THE CODE**
**AND/OR THE DEFENDANTS' ACTIONS WITH RESPECT TO ADAMS**

137.    Adams incorporates by reference paragraphs 1 through 136 as if each paragraph was set forth herein in its entirety.

138.    In issuing the Denial, the Director of Planning and Community Development is exercising unstructured, unlimited, and/or unbridled discretion in applying provisions of the Code—including but not limited to the definitions of "Off-Premise Sign" and "Commercial Message"—with respect to and against Adams.

139.    In denying Adams' request to erect a sign at Parcel No. 255/0708-023-4558-2 in the Airport Business Park in Middleton, Wisconsin, the Director of Planning and Community Development exercised unstructured, unlimited, and/or unbridled discretion with respect to and against Adams.

140.    In her denial email, the Director of Planning and Community Development explained: "The sign code contains no provisions allowing for permanent off-premise signage."

141.    As applied by Defendants with respect to and against Adams, the Code is vague, ambiguous, and/or overbroad and does not provide fair notice to Adams of the conduct proscribed or when a permit is necessary.

142.    Defendants are exercising unstructured, unlimited, and/or unbridled discretion in interpreting and applying the Code with respect to and against Adams.

143.    The Defendants' disparate treatment of Adams under the Code violates the Wisconsin Constitution, including but not limited to Article 1, §1.

144.    The Defendants' disparate treatment of Adams under the Code violates the United States Constitution, including but not limited to the Equal Protection Clause of the Fourteenth Amendment.

145.    The Defendants' disparate treatment of Adams under the Code is arbitrary, capricious, and/or unfounded; and otherwise results in the arbitrary deprivation of Adams' vested property interests without due process of law.

146.    As applied by Defendants with respect to and against Adams, the Code impinges on freedoms guaranteed by the Wisconsin Constitution, including but not limited to those freedoms guaranteed under Article 1, §3.

147.    As applied by Defendants with respect to and against Adams, the Code violates Adams' civil rights.

148.    As applied by Defendants with respect to and against Adams, the Code deprives Adams of its vested property rights.

149.    As a direct and proximate result of the City's actions and the Director of Planning and Community Development's actions as detailed throughout this Complaint, Adams has suffered (and will continue to suffer) damages.

150.    As a direct and proximate result of the City's actions and the Director of Planning and Community Development's actions as detailed throughout this Complaint, Adams has suffered (and will continue suffer) irreparable harm because, *inter alia*, it has been deprived of rights guaranteed to it under the United States Constitution and Wisconsin Constitution, including important and vested property rights and the right to engage in protected speech, and is subject to penalties and fines for any alleged violation of the Code.

## COUNT VII
## DECLARATORY JUDGMENT

151.    Adams incorporates by reference paragraphs 1 through 150 as if each paragraph was set forth herein in its entirety.

152.    Section 22.04(3)(c) of the Code provides, in relevant part: "Except for applications for approval of a Comprehensive Sign Plan, applications shall be approved or denied within thirty (30) days of the filing of a complete application or be deemed approved unless an extension of time for review is granted, in writing by the applicant."

153.    Adams filed a complete permit application addressed to the City Planner and Zoning Administrator for a type "O" sign on Parcel No. 255/0708-023-4558-2 on October 18, 2021 (the "Permit Application"). A true and correct copy of the Permit Application is attached hereto as Exhibit C.

154.    The City, the Plan Commission, the Director of Planning and Community Development, the City Planner and Zoning Administrator or any other officer of the City never notified Adams that the Permit Application was incomplete.

155.    The City, the Plan Commission, the Director of Planning and Community Development, the City Planner and Zoning Administrator, or any other officer of the City did not approve or deny the Permit Application within thirty (30) of October 18, 2021, by November 17, 2021.

156.    Adams did not grant an extension of time for the review of the Permit Application.

157.    The Permit Application is thus "deemed approved" under Section 22.04(3)(c) of the Code, which provides that permit "applications shall be approved or denied within thirty (30) days of the filing of a complete application or be deemed approved unless an extension of time for review is granted, in writing by the applicant."

158.    Under Section 22.04(3)(d) of the Code, Adams must erect the approved sign within six months of November 17, 2021, to avoid expiration of the permit, at which time the permit would "be null and void."

159.    Adams informed the City of its intent to erect the sign as approved under Section 22.04(3)(c) of the Code by letter on January 5, 2022. A true and correct copy of the January 5, 2022, letter is attached hereto as Exhibit D.

160. A letter from the City's counsel, dated January 10, 2022, states that the City will take "appropriate enforcement action" against Adams if Adams proceeds to construct the approved sign. A true and correct copy of the January 10, 2022, letter is attached hereto as Exhibit E.

161. There is a case of actual controversy as to Adams' rights and the City's obligations under the Code in relation to Adams' Permit Application.

162. Adams is entitled to judgment pursuant to 28 U.S.C. § 2201(a) declaring that the Permit Application was deemed approved under the provisions of Section 22.04(3)(c) of the Code.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Adams Outdoor Advertising Limited Partnership respectfully requests that this Honorable Court:

(a) declare that the City's Code (or portions thereof) violates the Wisconsin Constitution, including but not limited to Article 1, §3, and the United States Constitution, including but not limited to the First and Fourteenth Amendments, on its face by making content-based distinctions, regulations, and restrictions on speech, and is therefore invalid and unenforceable;

(b) declare that the City's Code (or portions thereof) violates the Wisconsin Constitution, including but not limited to Article 1, §3, and the United States Constitution, including but not limited to the First and Fourteenth Amendments, on its face by being vague, ambiguous, overbroad, and/or a violation of Procedural Due Process, and is therefore invalid and unenforceable;

(c) declare that the City's Code (or portions thereof) violates the Wisconsin Constitution, including but not limited to Article 1, §3, and the United States Constitution, including but not limited to the First and Fourteenth Amendments, on its face as a prior restraint, and is therefore invalid and unenforceable;

(d) declare that the City's Code (or portions thereof) violates the Wisconsin Constitution, including but not limited to Article 1, §1, and the United States Constitution, including but not limited to the Equal Protection Clause and Substantive Due Process Clauses, on its face, and is therefore invalid and unenforceable;

(e) declare that the City's Code (or portions thereof) violates Adams' (and those similarly situated to Adams) civil rights—including but not limited to those rights protected by 42 U.S.C. § 1983—and is therefore invalid and unenforceable;

(f) declare that the complete ban on "Off-Premise Signs" with "Commercial Messages" in the Code violates the Wisconsin Constitution, including but not limited to Article 1, §3, and the United States Constitution, including but not limited to the First and Fourteenth Amendments, on its face and is therefore invalid and unenforceable;

(g) declare that the manner in which Defendants are interpreting and applying the Code with respect to and against Adams, violates the Wisconsin Constitution and the United States Constitution;

(h) declare that the manner in which Defendants are interpreting and applying the Code with respect to and against Adams violates Adams' civil rights—including but not limited to those rights protected by 42 U.S.C. § 1983;

(i) preliminarily and permanently enjoin the Defendants from enforcing the Code and from issuing any civil fines and/or penalties to Adams (or those similarly situated to Adams) for a past, present, or future purported violation thereof;

(j) declare that the Denial is null and void;

(k) declare that the Permit Application filed by Adams on October 18, 2021, was approved under Section 22.04(3)(c) of the Code;

(l) declare that Adams holds a valid permit from the City under Section 22.04(3)(c) of the Code to erect a type "O" sign on Parcel No. 255/0708-023-4558-2;

(m) award damages to Adams for the violation of its rights—including but not limited to those rights protected by 42 U.S.C. § 1983 as detailed herein;

(n) award Adams its costs and fees (including reasonable attorney's fees) pursuant to 42 U.S.C. § 1988; and

(o) grant such further, additional, and/or other relief as this Court may deem equitable, just, and/or appropriate.

Dated this 31st day of January, 2022.        **PERKINS COIE LLP**

By: *s/ Brian H. Potts*
    Brian H. Potts (WBN 1060680)
    BPotts@perkinscoie.com
    David R. Zoppo (WBN 1094283)
    DZoppo@perkinscoie.com
    Juan J. Fonseca Angel (WBN 1116111)
    JFonsecaAngel@perkinscoie.com

**Perkins Coie LLP**
33 East Main Street, Suite 201
Madison, WI 53703
(608) 663-7465 (P)
(608) 663-7499 (F)

*Attorneys for Plaintiff*
*Adams Outdoor Advertising Limited Partnership*